UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                :

MACLIFF WOODLEY,
                          Plaintiff,     :    **MEMORANDUM**
          - against -              :    **DECISION AND ORDER**
                                     :
                                     :    CV-09-5709  (BMC)
THE CITY OF NEW YORK, THE NEW         :
YORK CITY POLICE DEPARTMENT,        :
DETECTIVE HARVEY at the 79th           :
PRECINCT DETECTIVE SQUAD and       :
"JOHN DOES" – Police Department Officers   :
whose names are not yet known or identified,    :
                                     :
                     Defendants.     :
                                     :
--------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff brought this action under 42 U.S.C. § 1983 asserting various claims in
connection with his arrest, prosecution, and subsequent acquittal on murder charges.[1]
Defendants have moved for summary judgment as to plaintiff's sole remaining claim, which is
for malicious prosecution.[2]  For the reasons stated below, defendants' motion is granted.

## BACKGROUND

As a threshold matter, this Court notes that plaintiff has failed to admit or deny any of the
factual allegations raised in defendants' 56.1 statement.  Rather, he lists various exhibits and

---

[1] Plaintiff's original complaint asserted claims for false arrest, malicious prosecution, and deprivation of liberty
without due process of law in connection with a "Wanted" poster accusing plaintiff of murder ("stigma-plus" claim).
Plaintiff voluntarily withdrew his false arrest claim because it was untimely and indicated to the Court that he was
only pursuing his malicious prosecution and stigma-plus claim.  On April 28, 2010, this Court dismissed the
"stigma-plus" claim as time-barred.

[2] The Court granted plaintiff leave to file an amended complaint to allege additional facts in support of his malicious
prosecution claim.  Plaintiff filed an amended complaint on June 4, which contains three causes of action.  However,
these three causes of action are essentially one claim for malicious prosecution that is re-stated three ways.

describes their content, while frequently interjecting argument as to what he thinks these exhibits mean. Although this Court is free to accept defendants' 56.1 statement in light of plaintiff's deficiencies, it has not. Instead, the Court has scrutinized the record and found the following facts, unless otherwise indicated, to be undisputed and supported by the record.[3]

## I.    Overview

The facts of this case center on the New York Police Department's ("NYPD") investigation into a shooting that took place on March 9, 2006, at 215A Lexington Avenue in Brooklyn, New York. During this incident, David Pierre ("Pierre"), a.k.a. "Dave" or "Croc" and Samuel Rayfield Osborne ("Osborne"), a.k.a. "Black" or "Blacks," were both shot. Pierre was killed and Osborne suffered injuries to his stomach, back, and leg.

Detective George Harvey ("Harvey") of the NYPD, 79th Precinct, was assigned as lead detective in the investigation of the shooting. He was part of a team of three to four other detectives who assisted him with the investigation. The other members of the team included Detectives Hennigan, Katinas, Scandole, and Prate. As part of his responsibilities as lead detective, Harvey maintained a case file containing DD5s, which are police department reports documenting work done in an investigation, prepared by himself and other detectives. The NYPD's only suspect in the shooting was plaintiff, Macliff Woodley ("Woodley"), a.k.a. "Smack." Plaintiff was arrested, tried, and ultimately acquitted of all charges.

## II.    The Investigation

On March 9, 2006, at approximately 4:43 p.m., Detectives Harvey and Hennigan responded to a radio run of two males shot in front of 215A Lexington Avenue in Brooklyn, New

---

[3] Plaintiff included in his 56.1 statement the trial testimony of two witnesses that testified in the underlying state criminal proceeding. This Court has not considered that testimony in this decision because what those witnesses ultimately said at trial is irrelevant to whether there was probable cause for defendants to prosecute plaintiff.

York. The building at 215A Lexington Avenue is a three or four story brownstone with a small gated area in front, and is located between Bedford and Nostrand Avenues. When the detectives arrived at the location, police patrol units had already set up a crime scene consisting of yellow crime scene tape spanning the area surrounding the shooting. The detectives proceeded to canvass the area in an attempt to locate evidence and possible witnesses.

They found seven spent silver .45 caliber shell casings scattered in the street opposite 215A Lexington Avenue. They also found one 9 mm spent shell casing in the airway of 215 Lexington Avenue, which is a house to the west of 215A. There was no blood in the street or on the sidewalk in front of 215A, but there was an accumulation of blood in one spot close to the fence in front of the house. The detectives noted that there were not many people out and that no crowd of onlookers had formed.

Three ambulances were also on the scene and EMS personnel were treating both victims. The first victim, Pierre, had sustained one gunshot wound to his chest and was transported to Woodhull Hospital where he was pronounced dead on arrival. The second victim, Osborne, sustained four gunshot wounds. He was transported to Bellevue Hospital for treatment.

In the ambulance, Osborne made a statement to an Officer Taveras, who was one of the first responding officers. Osborne told him that three black males approximately 20 years old approached the house at 215A Lexington Avenue, where Osborne and Pierre lived. Osborne and Pierre had approached the men and told them to "move on." Then, one or two of the men pulled out handguns and began shooting. Det. Harvey went to Bellevue Hospital to interview Osborne but was unable to because he was in surgery.

On the day of the shooting, Det. Katinas also spoke to Hazel Pope ("Pope"), who was a resident of a building on Lexington Avenue and one of the individuals who called 911. Pope

informed Katinas that she heard several gun shots and saw two black males, approximately 15 to 17 years old, running toward Bedford Avenue. She also indicated that she thought she saw one of the individuals throw something on the roof of a garage. Katinas contacted the Emergency Services Unit ("E.S.U."), which responded to the scene and searched the roof of the garage, but E.S.U. did not find anything.

Later that evening, at approximately 10:00 p.m., Detectives Harvey and Scandole interviewed Victor Vega ("Vega"), a neighbor of Osborne's and one of the 911 callers, at the 79th Precinct. Vega told the detectives that earlier that afternoon he was walking towards his house on Lexington Avenue when he saw three men standing outside the gate in front of Osborne's house. Osborne was standing inside the gate with another man Vega did not know. Vega noticed that Osborne was arguing with the man standing in between the two other men outside the gate, but Vega could not hear what the argument was about. As he continued towards his house, Vega observed that the man standing next to Osborne was trying to pull him into the house. When Vega was directly across the street from Osborne's house, he saw Pierre come running out of the house and start yelling at the man outside the gate. Pierre started to approach the gate as though he intended to confront the man. The man then took a couple steps back and pulled a silver automatic gun with a brown or beige handle out of his jacket pocket. Vega saw the man step back into the street and begin to shoot.

The first shot hit Pierre in the chest and he went down. Then, the man turned toward Osborne and began shooting at him. Osborne took a few steps toward the house and then went down. In total, the man fired four or five shots at Pierre and Osborne. When the man began to shoot, Vega observed that the other two men who were standing on either side of the shooter began to run, one towards Nostrand Avenue and the other towards Bedford Avenue. The shooter

started to run towards Nostrand Avenue but his hat fell off. The shooter then stopped, turned around towards Bedford Avenue to retrieve his hat, and continued to run towards Bedford. As the shooter passed Osborne's house again, he took two more shots in the direction of the house. The shooter then continued to run up the road and turned right at the corner of Bedford and Lexington Avenue.

A few hours after giving this statement, Assistant District Attorney ("ADA") Alfred Deingeniis from the Kings County District Attorney's Office, with Det. Scandole present, conducted an audio-taped interview of Vega. Vega's statement was almost identical to the statement he gave to the detectives, except this time he indicated to the ADA that he recognized the shooter as someone he had seen in the neighborhood. Although he did not know the shooter's name, Vega believed he had seen him maybe twice before. At no point in either of his interviews did Vega provide a physical description of the shooter.

On March 18, 2006, Det. Harvey interviewed Osborne at the 79th Precinct. Osborne informed Harvey that on the day of the shooting, he was standing in his yard with Pierre, when "Smack" (i.e., plaintiff) approached his house with another man, who he believed to be plaintiff's brother. Osborne got into an argument with plaintiff. Pierre then joined the argument and Osborne told him to go into the house, which he did. While Osborne was trying to calm plaintiff down, a third man approached from the right. Pierre then came out of the house, walked towards the group, and started yelling at plaintiff. Plaintiff and the other two men pulled out guns and Osborne heard shots. Both Osborne and Pierre were shot and fell to the ground. Osborne thought he heard more shots while he lay on the ground. He asked Pierre if he was okay, to which Pierre responded that he was hit in the chest, gasped, and then did not say another word.

Following the interview, Det. Harvey showed Osborne a series of photo arrays in which Osborne identified plaintiff as "Smack," the man he argued with and who had "pulled a gun." In the photo, plaintiff appeared with his hair in shoulder-length dreadlocks. Osborne also identified plaintiff's two brothers, Cleon and Sean Woodley, as the two men standing on either side of plaintiff at the scene of the shooting. Osborne indicated that, although all three men pulled out guns, plaintiff was the only person who fired his gun.

At approximately 1:20 p.m. that day, ADA Nicole Itkin conducted an audio-taped interview of Osborne at the 79th precinct at which Det. Harvey was present. Osborne's statement as to what happened leading up to the shooting was substantially similar to the account he told Harvey, except this time Osborne indicated that he knew "Smack" from the neighborhood. In fact, Osborne stated that he had known plaintiff for several years and that they used to gamble together. He also mentioned that he assumed plaintiff and the other men were "strapped" (i.e., carrying guns). In regard to his description of the shooting, Osborne reiterated that plaintiff had a gun, but much of the rest of his statement is inaudible.

After Osborne made the identifications in the photo arrays, Det. Harvey generated three "Wanted" posters in connection with the shooting. A poster was generated for plaintiff, another for Cleon, and another for Sean, each of which contained their respective photos. Plaintiff's poster contained his name, date of birth, and a photo of him with his hair in shoulder-length dreadlocks. It stated that he was wanted for murder in connection with the March 9 shooting and was considered armed and dangerous. The poster also listed plaintiff's last known address as 298 B Lexington Avenue in Brooklyn. Individuals with information were directed to contact Det. Harvey at the 79th Detective Squad.

Sometime during March 2006, Det. Harvey viewed the video from a grocery store that Det. Katinas had discovered on the date of the shooting. The grocery store is located on Bedford Avenue around the corner from 215A Lexington Avenue. The video depicted a black male with dreadlocks, wearing a "beige like" bomber jacket, running north on Bedford Avenue.

On April 5, Harvey, along with three other detectives and Sergeant Borrelli, went to 298 B Lexington Avenue in an attempt to apprehend plaintiff. Plaintiff was not present, and after canvassing the surrounding blocks for 45 minutes, the officers left. The officers went to the house again on April 20, and after canvassing the surrounding area for 45 minutes, were unable to apprehend plaintiff.

Sometime in April 2006, plaintiff learned that "Wanted" posters were being distributed in his neighborhood indicating that he was wanted for murder. Plaintiff retained an attorney named James Mischiano ("Mischiano") to represent him in any prospective criminal prosecution that might ensue from the "Wanted" posters. That same month, Mischiano contacted Det. Harvey at plaintiff's request, and put him on notice that plaintiff was represented by counsel and that Harvey should contact Mischiano going forward.

On May 17, 2006, Det. Prate, along with two other detectives, interviewed Pam Moore ("Moore"), Sean Woodley's girlfriend, as part of the investigation. Moore had been dating Sean since January 2005 and knew his siblings, including plaintiff. She told the detectives that one night in March, Sean got a phone call from a female that made him very upset. During the phone call Sean screamed, "Why did he have to do that, why did he have to do that?" When Moore asked Sean what was going on, he told her to mind her own business.

A few days after he had received the call, Sean asked Moore if she could find a place for plaintiff to stay. Moore owned a place in Far Rockaway, Queens and offered to rent plaintiff a

room. Plaintiff rented a room from Moore towards the end of March. During that time, she observed that plaintiff had cut off his dreadlocks and that his hair was cut close to his head. Plaintiff stopped renting a room from Moore after two weeks and she did not know where he stayed thereafter.

The same day that the officers interviewed Moore, an individual called the Crimestoppers hotline and reported to the police that she knew they were looking for "Smack" in connection with the shooting on Lexington Avenue. The caller stated that she heard "Smack" had killed someone on Lexington Avenue and she wanted to help the police catch him. She noted that she knew "Smack" for about 8 months and indicated that he was currently staying in the "Rockaways" on Mott Avenue near the White Castle. She also provided what she claimed was Smack's old phone number, (347) 993-1595, and his new phone number, (347) 683-9156.

On May 22 or 23, Sprint responded to a subpoena Det. Prate had served on it for subscriber information for cell phone number (347) 661-7195. Sprint disclosed that plaintiff was the subscriber and that he had activated this number on May 11, 2004. Sprint further indicated that the subscriber had disabled that number on April 17, 2006, and activated a new number, (347) 683-9156, which was currently active.

On May 19, Det. Prate obtained a court order for a Pen Register on cell phone number (347) 683-9156. Det. Harvey used the information provided by the Pen Register to trace the phone signal for (347) 683-9156 in order to locate plaintiff. Harvey did not obtain an arrest warrant for plaintiff. On May 23, 2006, Harvey and other detectives from the 79th Precinct apprehended plaintiff at an apartment he rented on Granada Place in Far Rockaway, Queens. When plaintiff was arrested, he no longer had dreadlocks and wore his hair cut close to his head.

The only facts disputed by the parties are the circumstances surrounding plaintiff's arrest. Plaintiff contends that on the date he was arrested, he had just gotten out of the shower when plain-clothes officers kicked down his door with their guns drawn. According to plaintiff, they ordered him to the ground, handcuffed him, did not read him his Miranda rights, and trashed his apartment looking for guns and other evidence. Defendants claim that plaintiff opened the door naked and then ran back into the shower. They further claim that they never searched plaintiff's apartment.

Later that night, Det. Harvey conducted two line-ups at the 79th precinct. Both line-ups consisted of plaintiff and five fillers, and all of the participants wore black "doo-rags" on their heads and were seated. In the first line-up, Osborne positively identified plaintiff and told Harvey that plaintiff was "Smack," the person who pulled out a gun and shot him. In the second line-up, Vega positively identified plaintiff and indicated to Harvey that although plaintiff "looked different without the hair," he was the same man that he saw shoot Osborne and Pierre. Plaintiff's attorney was not present for the line-ups.

After these two positive identifications, plaintiff was arrested and charged with second degree murder in violation of NY Penal Law § 125.25. Following plaintiff's arrest, Det. Harvey gave the case file to the Kings County District Attorney's Office. The file included the video recovered from the grocery store and DD5s memorializing the NYPD interviews with Vega, Osborne, and Pope.

### III. The State Court Proceedings

On May 24, 2006, Det. Harvey signed a criminal complaint that was prepared by the Kings County District Attorney's Office. The complaint stated that on March 9, 2006, plaintiff committed the offenses of: first degree assault, second degree murder, second degree attempted

murder, and second degree criminal possession of a weapon. It further provided that Harvey was informed by witnesses that plaintiff was in possession of a firearm and fired multiple shots at two individuals. It also set forth that one of the witnesses, who was also one of the two victims, informed Harvey that plaintiff shot him in the stomach and leg, and shot Pierre in the chest. Harvey indicated that the NYC Office of the Chief Medical Examiner informed him that Pierre died as a result of a gunshot wound to the chest.

Thereafter, two Grand Juries were convened; one for the shooting of Pierre, and the other for the shooting of Osborne. The first Grand Jury indicted plaintiff for second degree murder, second degree criminal possession of a weapon, and third degree criminal possession of a weapon, in connection with the death of Pierre. The trial judge conducted an *in camera* review of the Grand Jury proceedings regarding the criminal charges against plaintiff, and found the evidence presented to the Grand Jury was legally sufficient to support the indictment. The second Grand Jury indicted plaintiff for second degree attempted murder, first degree assault, two counts of second degree assault, and second degree criminal possession of a weapon in connection with the shooting of Osborne. Plaintiff was not present at any of the Grand Jury proceedings and does not know which individuals, if any, testified.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate only "where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the Court's responsibility "is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986)). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'." Weinstock v. Columbia Univ., 224 F.3d 33, 40-41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248, 106 S. Ct. 2505, and discussing summary judgment's historic origins "as a tool for clearing the calendar of doomed lawsuits"). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (internal quotation omitted).

The moving party bears the initial burden to show that there is no genuine issue of material fact, i.e., to show that the evidentiary support for its position is so strong that no reasonable trier of fact could disagree. Anderson, 477 U.S. at 256-57; see Fed. R. Civ. P. 56(c). Once the moving party has documented particular facts, "the opposing party must 'set forth specific facts showing that there is a genuine issue for trial'." Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) (quoting Fed. R. Civ. P. 56(e)). Although the Court views the evidence in the light most favorable to the non-moving party and draws inferences in its favor, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Industrial Co., 475 U.S. at 586, 106 S. Ct. 1348; see Anderson, 477 U.S. at 247-48, 106 S. Ct. 2505 ("[T]he mere existence of *some* alleged factual dispute between the parties" will not defeat a properly supported motion for summary judgment. (emphasis in original)).

Rule 56(e) requires that the opposing party marshal admissible evidence to rebut that of its opponent; inadmissible hearsay or conclusory assertions are generally insufficient. Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003). As the Supreme Court explained in Anderson, the nonmoving party cannot defeat summary judgment "without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial." 477 U.S. at 256, 106 S. Ct. 2505. Thus, a party may not defeat a motion for summary judgment solely through "unsupported assertions" or "conjecture." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see Anderson, 477 U.S. at 256 (citing Rule 56(e)). Rather, the nonmoving party must marshal "concrete evidence from which a reasonable juror could return a verdict in his favor." Id.; see Fed. R. Civ. P. 56(e).

## II.    **Malicious Prosecution**

Defendants have moved for summary judgment as to plaintiff's malicious prosecution claim against Det. Harvey and the City.[4]

### A. *Detective Harvey*

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." Manganiello v. City of New York, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor;

---

[4] Defendants also claim that, to the extent plaintiff has pled any state law claims, they should be dismissed for failure to comply with the notice-of-claim requirements set forth in New York General Municipal Law § 50-e. This Court does not interpret plaintiff's amended complaint as alleging any state law claims and plaintiff has not indicated otherwise.

(3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Id. at 161 (citations omitted).

Defendants do not dispute that the underlying state proceeding terminated in plaintiff's favor. Rather, they contend that the other elements of plaintiff's claim are not satisfied because: (1) the District Attorney's Office made an independent decision to prosecute; (2) there was probable cause to prosecute plaintiff; and (3) there is no evidence of any malice. In the alternative, defendants argue that Det. Harvey is entitled to qualified immunity.

Plaintiff, obviously, takes the contrary position. In particular, he focuses on the third element of his claim and argues that there was no probable cause to prosecute him. "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). Thus, as plaintiff's claim hinges on whether there was probable cause for his prosecution, this Court will address this element first.

Whether probable cause existed is ordinarily a question of fact for the jury, but may be determined as a matter of law "if there is no dispute as to the pertinent events and the knowledge of the officers." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); see also Rizzo v. Edison, Inc., 172 F. App'x 391, 393 (2d Cir. 2006) ("Probable cause is an objective standard; and it is a question of law whether undisputed facts constitute probable cause."). Other than the events occurring after defendants made the decision to arrest and executed it, plaintiff has not pointed to any material facts that are in dispute, and accordingly, the issue of probable cause can be determined as a matter of law.

"In the context of a malicious prosecution claim, probable cause under New York law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief

that he has lawful grounds for prosecuting the defendant in the manner complained of." Rounseville v. Zahl, 13 F.3d 625, 629 (2d Cir. 1994) (citation and quotation marks omitted). Probable cause to prosecute is described as "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003).

However, where, as here, there was an indictment by a grand jury, there is a presumption of probable cause. See Savino, 331 F.3d at 72. That presumption is only rebutted "by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Id. (quoting Colon v. City of New York, 60 N.Y.2d 78, 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983)). For example, the presumption may be rebutted where there is "evidence establishing that the police witnesses have not made a complete and full statement of the facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." Colon, 60 N.Y.2d at 82-3, 468 N.Y.S.2d 453, 455 N.E.2d 1248; see also Boyd, 336 F.3d at 76. It may also be rebutted "[w]here there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have lied in order to secure an indictment, and a jury could reasonably find that the indictment was secured through bad faith or perjury." Manganiello, 612 F.3d at 162 (citation and quotation marks omitted). "The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the Grand Jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'" Rothstein v. Carriere, 373 F.3d 275, 284 (2d Cir. 2004) (quoting Colon, 60 N.Y.2d at 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248.)

Plaintiff does not allege – nor is there any evidence in the record – that the indictments were secured through fraud, perjury, or the suppression of evidence. In fact, the record is devoid of what happened during the Grand Jury proceedings, i.e., who testified or the nature of their testimony. Thus, without knowing what occurred during those proceedings, plaintiff is unable to identify specific facts in the record that would enable a reasonable jury to conclude that the indictments were procured in bad faith.

Instead, plaintiff attempts to rebut the presumption of probable cause in two ways. First, he focuses on the circumstances surrounding his arrest. Although plaintiff's argument is not clearly stated, it appears to be that because he was arrested without a warrant, there was no probable cause for his arrest, and because his arrest was unlawful, there was no probable cause to prosecute. Second, plaintiff identifies various aspects of the NYPD investigation that he deems "inappropriate" police conduct, and argues that a jury could conclude that Det. Harvey's "inappropriate" actions constitute bad faith.

### (1) The Arrest

In support of his claim that his arrest was unlawful, plaintiff points to the fact that the District Attorney's Office declined to issue a warrant, and that Harvey could have, and should have, waited to secure a warrant before making an arrest. He also contends that Harvey's version of the facts surrounding his arrest is "incredible" and should be rejected by this Court.

Police officers enjoy considerable discretion when making arrests. "An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006) (citation and quotation marks omitted). An officer only needs to

have probable cause, based on the totality of the circumstances, that a crime has been committed to make a warrantless arrest. See Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317 (1983); Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000). Probable cause is determined by looking at the facts available to the police at the time of arrest and immediately before it. See Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996).

Nevertheless, it is "[t]he continuation of a criminal proceeding without probable cause [that] amounts to malicious prosecution." Coleman v. City of New York, 49 F. App'x 342, 345 (2d Cir. 2002). "Under New York law, even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause." Lowth, 82 F.3d at 571 (internal quotation marks omitted). "'In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact,' which may include proof that the police falsified, misrepresented or suppressed evidence during a criminal proceeding." Coleman, 49 F. App'x at 345 (quoting Lowth, 82 F.3d at 571).

Despite the fact that Harvey did not obtain a warrant, there is ample evidence in the record that he had probable cause to arrest plaintiff. The victim had identified the shooter as a black male with dreadlocks and picked plaintiff's photo out of the array. This was consistent with the video from the grocery store, which depicted a black male with dreadlocks running down the street on the day of the shooting. Moreover, the information provided by the anonymous tipster identifying plaintiff as the shooter was corroborated by other evidence. For example, Moore had told the detectives that plaintiff was living in Far Rockaway during March, and the Sprint records confirmed plaintiff's current cell phone number.

All of the evidence Harvey had obtained up to that point, and all the evidence he collected thereafter, implicated plaintiff. In fact, the case against plaintiff became even stronger

post-arrest because both Osborne and Vega had positively identified plaintiff in a line-up. This evidence was more than sufficient to establish probable cause to continue to prosecute plaintiff after his arrest. See Rizzo, 172 F. App'x at 393-94 ("As no exculpatory evidence became known after Plaintiff's arrest, there was also probable cause to prosecute her."); McDermott v. City of New York, 94-cv-2145, 1995 WL 347041, *5 (E.D.N.Y. May 30, 1995) ("In the absence of some indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest, no claim for malicious prosecution may lie.").

There was also no need for Det. Harvey to wait for a warrant where there was already probable cause to arrest plaintiff and there was ample evidence to suggest that plaintiff was avoiding the authorities. After disseminating the "Wanted" posters in mid-March, Harvey attempted to apprehend plaintiff at his last known address on at least two occasions, to no avail. He had also received information that plaintiff had moved to a different location, changed his appearance, and started using a new cell phone number. The record reflects that Harvey sought to arrest plaintiff almost immediately after Sprint confirmed that (347) 683-9156 was plaintiff's current cell phone number, and he was able to trace plaintiff's location using the information obtained from the Pen Register. No inference of bad faith can be drawn on these facts.

With regard to the manner in which plaintiff was arrested, plaintiff fails to identify how the circumstances surrounding his arrest caused the indictments to be tainted in some way. Instead, he argues that because Det. Harvey's recollection of the arrest is "incredible," the arrest was somehow unlawful. Even assuming Det. Harvey's version of how he entered plaintiff's apartment is inaccurate, there is no evidence that he testified before the Grand Jury, let alone testified regarding the nature of the arrest. In addition, even if the officers did search plaintiff's

apartment subsequent to his arrest, it is undisputed that no evidence was recovered from that apartment and used against him at trial. All in all, plaintiff has failed to show how the circumstances of his arrest are even material, let alone significant enough to rebut the presumption of probable cause created by the indictments.

### (2) The Investigation

Plaintiff also claims that Det. Harvey conducted an insufficient investigation, and argues that had he conducted a complete investigation and explored all the evidence, it would have indicated that he had the wrong suspect. Specifically, plaintiff cites to: (1) the lack of physical evidence, including DNA and fingerprints, to inculpate plaintiff; (2) the presence of a different caliber shell, which suggests there was another shooter; (3) the fact that Harvey reviewed the DD5s prepared by other officers, instead of interviewing the witnesses personally or the officers that took the their statements; (4) the inconsistencies in Osborne's statements, which suggests that he was tailoring his testimony; and (5) Harvey's failure to allow plaintiff to contact his attorney and have him present at the line-ups, in violation of his Sixth Amendment right to counsel.[5]

It is important to note that the issue is not whether Det. Harvey could have done what plaintiff considers to be a more thorough investigation, or even if he made mistakes in conducting the investigation that he chose to do. Plaintiff's claim is for "malicious" prosecution, not "negligent" prosecution. See Mitchell v. County of Nassau, No. cv-05-4957, 2007 WL 1580068, *13 (E.D.N.Y. May 24, 2007) ("As a matter of public policy, New York does not

---

[5] Plaintiff has not alleged a Sixth Amendment claim in his complaint or pled any facts that would support such a claim. Thus, to the extent plaintiff is attempting to assert a Sixth Amendment claim for the first time in his opposition to defendants' motion for summary judgment, this Court will not consider the claim. See Lyman v. CSX Transp., Inc., 364 F. App'x 699, 701 (2d Cir. 2010) (affirming the district court's determination that plaintiff's claims that were raised for the first time in opposition to summary judgment "need not be considered"); Greenidge v. Allstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach merits of argument raised for first time in opposition to summary judgment).

recognize a claim for negligent investigation and prosecution.); see also Aretakis v. Durivage, 1:07-cv-1273, 2009 WL 249781, *31 (N.D.N.Y. Feb. 3, 2009) (collecting cases).

To be sure, there is some qualitative and quantitative level of inadequate police work that may, in some cases, give rise to an inference of deliberate malfeasance or neglect so gross that it is its equivalent. See, e.g., Hernandez v. State, 228 A.D.2d 902, 905, 644 N.Y.S.2d 380 (3d Dep't 1996) (finding a jury could infer that an officer's failure to carry out the most rudimentary investigation, by failing to substantiate in any way the residence, age, or occupation of the individual he made an undercover purchase of cocaine from, to be grossly negligent conduct sufficient to overcome the presumption of probable cause). But this is not that case. At best, the evidence suggests that Det. Harvey could have conducted a more thorough investigation, which – without more – is insufficient to rebut the presumption. See Gil v. County of Suffolk, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) ("Any alleged failure to conduct further investigation or apply all procedures that could have been followed does not amount to fraud, bad faith or the suppression of evidence and is insufficient to overcome the presumption."); Walczyk v. Rio, 496 F.3d 139, 160 (2d Cir. 2007) (noting that police officers are not required to investigate every source of exculpatory evidence before establishing probable cause to arrest). The facts giving rise to probable cause were not merely sufficient; they were overwhelming. Thus, this Court fails to see how a reasonable jury could find that any of plaintiff's claims rebut the presumption of probable cause created by the indictments.

In regard to the inconsistencies in Osborne's statements, plaintiff's claim would arguably have more merit if Osborne was the only witness. However, both Osborne and Vega relayed similar accounts of the shooting and both identified plaintiff in separate line-ups. The fact that Osborne had some inconsistencies in his statements, and a jury may have ultimately chosen to

discredit his testimony because of those inconsistencies, does not mean Det. Harvey lacked probable cause to prosecute plaintiff. See Warren v. Byrne, 699 F.2d 95, 98 (2d Cir. 1983) (noting that the dismissal of criminal charges has no bearing "in and of itself on want of probable cause").

This Court also fails to see how the lack of counsel at the line-ups caused the indictments to somehow be procured in bad faith. Plaintiff does not allege that the line-ups were unconstitutional or that Osborne and Vega's identifications were tainted in some way. Nor does he indicate how the absence of counsel negatively impacted him.

The theory of plaintiff's case appears to be that since he was acquitted at trial, his constitutional rights must have been violated. That is emphatically not the law. Det. Harvey had more than sufficient probable cause to arrest plaintiff and to continue the prosecution thereafter.

Because this Court finds that Det. Harvey had probable cause for the prosecution, this Court does not need to address his qualified immunity defense. See Dawson v. Snow, 356 F. App'x 526, 529 (2d Cir. 2009).

### B. City of New York

Plaintiff has only addressed the malicious prosecution claim against Det. Harvey in his opposition papers, and has failed to even acknowledge any claim against the City. Accordingly, any claim plaintiff might have had against the City for malicious prosecution is deemed abandoned. See Banushi v. City of New York, No. 08-cv-2937, 2010 WL 4065414, *4 (E.D.N.Y. Oct. 15, 2010); Arias v. NASDAQ/AMEX Mkt. Group, No. 00-CV-9827, 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where plaintiff's summary judgment opposition "neither refute[d] nor even mention [ed]" defendant's argument for summary judgment on two of his claims); see also Local Civ. Rule 7.1.

Nevertheless, even if plaintiff had opposed defendants' motion for summary judgment in favor of the City, his claim would be without merit. First, plaintiff's amended complaint is completely devoid of any factual allegations that would be sufficient to state a claim against the City for municipal liability. See Monell v. Dep't of Social Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978) (municipality can only be held liable for the unconstitutional acts of its employees where the employees acted pursuant to an official policy or custom that caused the plaintiff to be subjected to a denial of a constitutional right). Second, as this Court has already found that Det. Harvey did not violate plaintiff's constitutional rights, plaintiff could not maintain a claim against the City. See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted) ("[It is] well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").

## CONCLUSION

Defendants' [24] motion for summary judgment is granted. The Clerk is directed to enter judgment in favor of defendants.

**SO ORDERED.**

U.S.D.J.

Dated: Brooklyn, New York
        November 10, 2010